**CANTON BIO–MEDICAL, INC., Plaintiff,**

v.

**INTEGRATED LINER TECHNOLOGIES, INC., Defendant.**

No. 97–CV–467 (FJS).

United States District Court, N.D. New York.

Aug. 13, 1998.

**24**

White & Case, LLP, New York City (Edward V Filardi, John Scheibeler, of counsel), Murphy, Burns, Barber, & Murphy, LLP, Albany, NY (Peter G. Barber, of counsel), for Plaintiff.

Hancock & Estabrook, LLP, Syracuse, NY (James R. Muldoon, of counsel), for Defendant.

## MEMORANDUM–DECISION AND ORDER

SCULLIN, District Judge.

### Introduction

This is an action for patent infringement. The Plaintiff, Canton Bio–Medical, Inc., alleges that the Defendant's patent, U.S. Patent No. 5,647,939 ("the '939 patent"), and other related processes infringe their patent, Patent No. 4,499,148 ("the '148 patent"). Presently before the Court is the Defendant Integrated Liner Technology, Inc.'s ("ILT's") motion for summary judgment brought pursuant to Rule 56 of the Federal Rules of Civil

Procedure. Defendant argues that its accused process does not infringe the Plaintiff's patent as a matter of law based on the application of prosecution history estoppel.

Oral argument was held on May 8, 1998, at which time the Court reserved decision on the Defendant's motion and authorized the parties to submit additional briefing.

## Factual Background

Both Plaintiff and Defendant manufacture products called septa. Septa are small laminated rubber discs which are used in the pharmaceutical and medical industries for self-sealing vial caps which permit the insertion of a hypodermic needle without contaminating the inside of the vial. Both parties' products consist of a silicone rubber component which is fused to a polyolefin plastic component.

## History of Plaintiff's '148 Patent

In their motion, the Defendant focuses on Claim 1 of the '148 patent, as its elements are incorporated into all the other claims of the patent. Claim 1 reads:

1. A method of chemically bonding elastomeric materials to chemically inert polyolefins, the method comprising:

(a) exposing a chemically inert polyolefin surface to a corona discharge treatment,

(b) applying to the corona discharge treated surface of the polyolefin a primer solution of ethyl silicate, ethyl ortho silicate and tetra butyl titanate in an organic solvent,

(c) placing the treated and primed surface of polyolefin in contact with the surface of an uncured elastomeric compound of molecular weight above 61,000 with a minimum elongation modulus of fifth percent; and

(d) applying heat to the composite material to cure the elastomeric compound article firmly together whereby upon curing of the elastomeric material the polyolefin will be firmly and securely bonded thereto.

In plain language, this patent refers to a process which chemically bonds silicone rubber to plastic. The Plaintiff's process entails taking the "polyolefin" surface, which in the case of the Plaintiff's product is the inner surface of a plastic cap, and exposing it to a "corona discharge treatment." A corona discharge is a type of electrical treatment which slightly alters the molecular structure of the surface of the plastic. After the corona treatment, the Plaintiff applies a primer of ethyl silicate, ethyl ortho silicate and tetra butyl titanate to the surface. The process then requires the application of an "uncured elastomeric compound," which is simply uncured silicone rubber, to the treated surface of the plastic. Heat and pressure are applied which trigger a chemical reaction causing the molecules of the plastic to bond with the molecules of the rubber, and also causing the silicone rubber to cure or harden. The ethyl and ethyl ortho silicate acts as a sort of a molecular glue and the tetrabutyl titanate acts as a catalyst, promoting a reaction between the surface of the silicone rubber and the plastic. The end result is a plastic cap with a hardened or "cured" silicone rubber "septum" fused on the inside surface. This process is used to make cap/closures for sealed medical vials, and also to create plastic/rubber catheters.

The Plaintiff originally applied for a patent on this process on January 10, 1983. The Plaintiff, in its application, made reference to the fact that the process of bonding silicone rubber to plastic using corona discharge treatments had already been contemplated by prior patented processes (the Hurst '368 Patent). However, Plaintiff's application distinguished the Hurst '368 patent from its process on the basis that the "Hurst" process did not utilize a primer to promote adhesion between the silicone rubber and the substrate, and did not use *uncured* silicone rubber.

On February 22, 1984, the Plaintiff's patent application was rejected as being obvious in light of prior art. *See* 35 U.S.C. § 103. In support of their rejection, the patent office cited the "Hurst" patent as well as the "Stevenson" patent, "Young" patent, "McBride" patent, and the "Hamada" patent as relevant prior art which rendered the Plaintiff's patent obvious.

The action report stated as follows: (1) that the "Hurst" patent:

teaches the corona discharge treatment of elastomers or polyolefins (such as polyethylene) to increase adhesion. He also teaches the process of bonding an elastomeric material to a polyolefin film using primer.

(2) the "Stevenson" Patent:

teaches a method of bonding elastomeric material (preferably, silicone rubber) to substrates via the use of primers. He specifically recites the use of ortho silicates and silanes as components of the primer solution. He also teaches the bonding process *prior* to the curing of the elastomeric material. Further he recommends pretreatment of the substrate prior to the application of the primer.

(3) the "Young" patent:

teaches a similar method of bonding silicone rubber to substrates using a primer comprising a mixture of titanate and silicates in an organic solvent ... He also teaches the process of bonding prior to curing the elastomer.

(4) the "McBride" patent:

teaches as notoriously known in the art the bonding of polyolefins to a silicone resin by means of a primer 'chemically similar to the base film' to improve adhesion.

and (5) the "Hamada" patent:

teach[es] the use[ ] of primers comprising titanate and silicates in organic solvent for improving the adhesion between silicone rubber and a substrate.

The action report closed stating:

It is within the level of skill in the art to use elastomers with molecular weights above 61,00 and modulus of elongation above 50%, to apply the elastomer in liquid form (molding), and to apply it to articles such as closures, pipes, and sheets. Therefore, in the absence of unexpected results, it is obvious to the skilled artisan that a method and article comparable to the claimed invention is developed from the combination of the aforementioned references ... No claim is allowed.

In a reconsideration request, the Plaintiff attempted to distinguish this prior art cited by the patent office. They distinguished the "Hurst" patent as not really relating to the permanent adhesion of silicone rubber and plastic, as did the '148 patent, but instead describing the temporary adhesion of the two elements to provide for a controlled release. They distinguished the "Stevenson" and "Young" patents as relating to the bonding of silicone rubber to all other kinds of substrates such as metal, wood, and fabric, but not plastic, as the '148 patent purports to do. They distinguished the "McBride" patent as relating to the use of primers to coat plastic with silicone film rather than the adhesion of a "free-standing" sample of plastic with a free-standing (though uncured) sample of silicone rubber. Finally, they distinguished the "Hamada" patent on the basis that Hamada's primer elements were more generic than the "specific" components used in the applicant's patent.

Following the reconsideration request, the patent office, with minor modifications, approved the Plaintiff's '148 patent.

## The Accused Process

The Defendant ILT manufactures and sells a product which is comprised of a septum bonded to a polypropylene cap under the trademark INTERSEAL based on a process described in the Plaintiff's patent, U.S.Patent No. 5,647,939 ("the '939 patent"). INTERSEAL closures are the only closures that the Defendant has made, used, sold or offered for sale that bond silicone rubber to a polyolefin. The Defendant's patent was approved on July 15, 1997. ILT's process for producing INTERSEAL closures (Teflon/silicone shields fused to certain types of plastic caps) is as follows:

bonding a thin layer of Teflon to a sheet of silicon rubber by well known means, such as pressing and curing the rubber upon an etched and primed Teflon film; sections of the cured silicone rubber/ Teflon laminate are cut in small circles to tightly fit within the interior of an open top; the internal flange of a polypropylene cap is ionized by corona discharge treatment; the inner surface of the cap's flange is primed with a highly diluted solution of amonosilane of

formula N–(2–amioneth yl)–3–amonopropyltrimethoxsilane in isoproponol and air dried.

The silicone rubber laminate is then treated on the surface of the silicone rubber by corona discharge treatment.

The laminate is then immediately inserted into the cap and pressure is applied to the Teflon face of the laminate and heated to about 120$ C. When the pressure is removed and the cap is allowed to cool to room temperature, the silicone rubber/Teflon laminate is bonded directly to the interior flange of the polypropylene opened top cap.

In plain language, the Defendant's process takes a sheet of silicone rubber and cures or hardens it while coating it with a thin layer of Teflon. The sheet is then cut into small circles which are sized to fit snugly into polypropylene (plastic) caps. The inner surface of the cap is ionized with a corona discharge and primed with certain primer. The septum is then placed in the cap and heat and pressure are applied to the two items. When the cap is cooled to room temperature the two items are fused together.

### Discussion

Under Rule 56(c), summary judgment is warranted if, when viewing the evidence in a light most favorable to the non-movant, the court determines that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 457, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *Commander Oil v. Advance Food Serv. Equip.*, 991 F.2d 49, 51 (2d Cir.1993). To survive a motion for summary judgment the non-movant must do more than present evidence that is merely colorable, conclusory, or speculative. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The non-movant must offer evidence that demonstrates that there are issues of fact that must be decided by a fact finder because "they may reasonably be decided in favor of either party." *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir.1990).

### I. RULE 56(f)

■ As an initial matter the Plaintiff opposes the Defendant's summary judgment motion on the basis of Rule 56(f), arguing that it requires additional discovery to properly defend the Defendant's motion. Rule 56(f) provides:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed.R.Civ.P. 56(f). The affidavit of the party invoking Rule 56(f) must specifically include: (1) the nature of the uncompleted discovery; (2) a showing of how the facts sought are reasonably expected to create genuine issues of material fact; (3) what efforts affiant has made to obtain those facts; and (4) an explanation of why those efforts were unsuccessful. *See Young v. Corbin*, 889 F.Supp. 582, 584 (N.D.N.Y.1995) (citing *Paddington Partners v. Bouchard*, 34 F.3d 1132 (2d Cir. 1994)).

■ In their papers, Plaintiff claims to need further information about (1) the process parameters used by the Defendant in its initial "curing" step of its process, and (2) and the process parameters used in the "bonding" step. The Plaintiff contends that this information is vital to determining whether the Plaintiff's septum (silicone rubber element) is partially cured and/or whether additional curing takes place during bonding.

However, as the Court stated at oral argument, the two material issues in this motion are (1) claim construction of the Plaintiff's patent, and (2) the applicability of prosecution history estoppel to preclude the Plaintiff from asserting infringement under the doctrine of equivalents. Both of these issues are questions of law which are determined based upon the patent application, specifications and the prosecution history of the patent. If the Court does require additional extrinsic

evidence to construe the Plaintiff's claims it may rely on dictionaries, treatises, and if needed, expert opinion.[1] Thus, the Plaintiff's requested further discovery should not affect the Court's decision on this motion.

Secondly, to the extent that Plaintiff seeks to create an issue of fact as to whether Plaintiff's septa are fully cured or only partially cured prior to bonding, based on the Court's claim construction discussed below, that issue of fact is not material. Therefore, the Court finds that Plaintiff's Rule 56(f) objection is without merit and the Court will proceed to consider the merits of the Defendant's summary judgment motion.

## II. PATENT INFRINGEMENT INQUIRY

A patent infringement inquiry requires two steps: (1) a proper construction of the asserted claim; and (2) a determination as to whether the accused product or process infringes the asserted claim as properly construed. *See Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1581 (Fed.Cir.1996) (citing *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976 (Fed.Cir.1995), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 1393, 134 L.Ed.2d 577 (1996)). The first step, claim construction, is a matter of law, *see id.;* the second step, infringement, is in most cases a question of fact. *See Lockwood v. American Airlines, Inc.,* 107 F.3d 1565, 1573 (Fed.Cir.1997).

### A. Claim Construction of the '148 Patent

As stated, when interpreting a claim, the court must first look to the intrinsic evidence of record, i.e., the patent itself, including (1) the claims, (2) the specification, and (3) the prosecution history. *See Vitronics,* 90 F.3d at 1582 (citing *Markman,* 52 F.3d at 979).

The court first looks to the words used in the claims and gives them their ordinary and customary meaning in the field of

that invention, unless the inventor specifically defines the word differently in the patent specification. *See id.* (citing *Hormone Research Found., Inc. v. Genentech, Inc.,* 904 F.2d 1558, 1563 (Fed.Cir.1990)).

Second, the court looks to the inventor's use of the words in the patent specification to see if the word's use in context is consistent to the definition ascribed. *See id.*

Third, the court considers the prosecution history of the patent, if any. This history contains the complete record of the proceedings before the Patent and Trademark Office, and usually includes express representations made by the inventor concerning the scope of the patent. *See id.*

In most situations, evaluation of this intrinsic information is sufficient to resolve any ambiguity in a disputed claim term and in such cases it would normally be improper to consider extrinsic evidence. *See Vitronics,* 90 F.3d at 1583. This general rule exists because the public record of the patent is what the public relies on for notice of the scope of a protected invention; allowing the record to be altered or changed by extrinsic evidence introduced, such as expert testimony, would render this notice meaningless. *See id.* (citing *Southwall Technologies, Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1578 (Fed. Cir.1995)).

Where, however, intrinsic evidence is insufficient to enable the court to determine the meaning of a disputed term, the court may turn to extrinsic evidence. *See id.* at 1584. Extrinsic evidence may consist of dictionaries, technical treatises and articles, expert testimony, and inventor testimony. *See id.* (citing *Markman,* 52 F.3d at 980).[2]

In the present case, the Plaintiff argues that the intended scope of its claim covers a process for bonding both cured and uncured silicone rubber. Claim 1 calls for

---

1. Each of these items has been submitted by the parties.

2. Technical treatises and dictionaries, while considered extrinsic evidence, are the most reliable and objective of the extrinsic evidence sources.

*See id.* at 1585. Dictionaries and treatises may be used at any time by the court in construing terms, so long as the dictionary definitions do not contradict the express or implied meaning in the patent record. *See id.* at 1584 n. 6.

"placing the treated and primed surface of polyolefin in contact with the surface of an *uncured* elastomeric compound of molecular weight" (emphasis added).[3] As a threshold matter, Plaintiff contends that the term "uncured" as used in their claim should be construed as encompassing "any uncured or *partially cured* silicone." (Pl. Opp. Brief at 13). Plaintiff argues that partially cured silicone rubber contains an uncured element, and therefore based on its argued claim construction, should be considered "uncured" and within the scope of Plaintiff's Claim 1.

The Court cannot agree with the Plaintiff's suggested claim construction. The words used in the Plaintiff's claim specify that the silicone rubber elastomer to be used is "uncured," not "uncured or partially cured."[4] Plaintiff's patent refers to the silicone rubber elastomer several more times in the specification as "uncured" (in the "Discussion of Prior Art" section, "Detailed Description of the Invention" section, and in Examples one—three). While the patent specification sets forth no special meaning for the term "uncured," the Court will assume the term represents its common meaning in the scientific field. *See Vitronics*, 90 F.3d at 1584. In *The Compilations of ASTM Standard*

*Definitions*, "cure" is defined as "to change the properties of a polymeric system into a more stable, useable condition by the use of heat, radiation, or reaction with chemical additives." 135 (8th ed.1994) (the ASTM is the American Society for Testing and Materials). The ASTM treatise also equates "cure" with the preferred term. "vulcanization." *See id.* "Vulcanization" is defined as "an *irreversible* process during which a rubber compound, through a change in its chemical structure (for example, cross-linking), becomes less plastic and more resistant to swelling by organic liquids and elastic properties are conferred, improved, or extended over a greater range of temperatures." *See id.* at 565.[5] Thus, the Court finds that the term "uncured" in the Plaintiff's patent claims refers to a silicone rubber elastomer that is *not cured*, that is, it has not been exposed to heat and/or chemicals so that its chemical structure has not irreversibly changed to exhibit the characteristics of vulcanized rubber.[6]

■ The Court therefore construes the term "uncured" in the Plaintiff's '148 patent claim as referring to an elastomeric compound which has not undergone any curing or vulcanization process.[7]

3. The definition of "uncured" is dispositive on the question of literal infringement, because the Defendant's bonding process calls for a "cured" sample of silicone elastomer.

4. Using uncured silicone is necessary because the silicone and polyolefin are bonded and cured in the same step later in the process.

5. See also *Hawley's Condensed Chemical Dictionary* which defines "curing" generally as "conversion of a raw product to a finished and useful condition, usually by application of heat and/or chemicals that induce physicochemical changes," and the curing of rubber as: "Addition of sulfur and accelerator, followed by exposure to heat, which effects cross-linking. This converts the material from a thermoplastic to thermosetting product. High energy radiation can also be used. See vulcanization." Van Nostrand Reihold (13th ed., 1997).

6. Since "curing" or "vulcanization" is an irreversible process, the term "partially cured" is not, as the Plaintiff suggests, equivalent to the term "uncured" because any curing at all permanently alters the properties of the silicone making the physical states of uncured silicone and partially cured silicone mutually exclusive.

7. Plaintiff's argument that the prosecution history supports the conclusion that the term "uncured" was meant to include "partially cured" is also without merit. The statement in the prosecution history referring to the Plaintiff's process as being capable of joining a polyolefin and an "uncured or partially cured" silicone rubber, indicates that the inventors distinguished between "uncured" and "partially cured," as separate physical states. (*See* Muldoon Decl., Ex. C at 54.) However, the prosecution history cannot be relied upon to expand the scope of Plaintiff's patent to cover both partially cured and uncured states. While the prosecution history may be used to define terms within the claim itself, it cannot be used to "enlarge, diminish, or vary" the limitations in the claim. *Markman*, 52 F.3d 967 (citing *Goodyear Dental Vulcanite Co. v. Davis*, 102 U.S. 222, 227, 26 L.Ed. 149 (1880)). Thus, while the Plaintiff's reference to both uncured and partially cured silicone in the prosecution history is useful to demonstrate that the Plaintiff knew there was a difference between the two states, it cannot be used to expand the scope of the claim itself which refers only to *uncured* silicone.

## B. Infringement

As stated, the Defendant maintains that the application of prosecution history estoppel precludes the Plaintiff from asserting infringement under the doctrine of equivalents. Before consideration of this legal principal, the Court will first look to the basis for the Plaintiff's claim of infringement. In order for the Plaintiff to establish a claim for infringement, it need show that *every element* of Claim 1 to the '148 patent claims is found in the accused product, either literally or under the doctrine of equivalents. *See CVI/Beta Ventures, Inc., v. Tura LP,* 112 F.3d 1146 (Fed.Cir.1997).

### (1) Literal Infringement

■ Based on the Court's construction of Claim 1 as discussed above, the Court concludes that there can be no literal infringement by the Defendant's process because it does not utilize an uncured silicone rubber elastomer.[8] Furthermore, with respect to another element in Claim 1, the Plaintiff has conceded that the '148 patent is not literally infringed by the Defendant's process because of the difference between the elements of the Defendant's and Plaintiff's primer.

### (2) Infringement Under the Doctrine of Equivalents

■ Even if an accused device does not literally infringe a plaintiff's patent, it may still infringe the patent under the doctrine of equivalents if it performs substantially the same overall function or work, in substantially the same way, to produce substantially the same overall result as the claimed invention. *See Dolly, Inc. v. Spalding & Evenflo Companies, Inc.,* 16 F.3d 394, 397 (Fed.Cir.1994) (citing *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 94

L.Ed. 1097 (1950)). However, this test is not applied in the general sense, but must be applied to each and every element and limitation of the plaintiff's claim. *See Warner–Jenkinson Co., Inc. v. Hilton Davis Chemical Co.,* 520 U.S. 17, 117 S.Ct. 1040, 1049, 137 L.Ed.2d 146 (1997).[9]

■ Whether a patent is infringed under the doctrine of equivalents is question of fact. *See Markman,* 116 S.Ct. at 1393. However, whether an infringement action under the doctrine of equivalents is precluded by the application of "prosecution history estoppel" is a question of law. *See Mark I Marketing Corporation v. R.R. Donnelley & Sons Co.,* 66 F.3d 285, 291 (Fed.Cir.1995) (citing *LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n,* 867 F.2d 1572, 1576 (Fed. Cir.1989)).

■ Prosecution history estoppel precludes a patentee from obtaining infringement protection under the doctrine of equivalents for subject matter which was relinquished during the prosecution of the claim in order to distinguish prior art or otherwise gain acceptance of the patent. *See Lockwood,* 107 F.3d at 1574 (citing *Zenith Laboratories, Inc. v. Bristol–Myers Squibb Co.,* 19 F.3d 1418, 1424 (Fed.Cir. 1994)). The prosecution history of a patent:

consists of the entire record of proceedings in the Patent and Trademark Office. This includes all express representations made by or behalf of the applicant to the examiner to induce a patent grant,.... Such representations include amendments to the claims and arguments made to convince the examiner that the claimed invention meets the statutory requirements of novelty, utility, and nonobviousness.

---

8. While Plaintiff's expert testifies that it is his opinion that the septa cured by the Defendant contain some degree of uncured silicone, he does not opine that the entire septa is uncured. At best the Plaintiff's expert affidavit creates a issue of fact as to whether the Defendant's septa should be considered "cured" or "partially cured." This issue of fact is not material, however, because based on the Court's claim construction neither a cured or partially cured septa *literally* reads upon the Plaintiff's claim which requires an *uncured* silicone septa.

9. Further, the doctrine of equivalents can not be used to expand the scope of a plaintiff's claims; "the doctrine of equivalents is not a license to ignore or 'erase structural and functional limitations of the claim' on which the public is entitled to rely." *See Athletic Alternatives, Inc. v. Prince Manufacturing, Inc.,* 73 F.3d 1573, 1582 (Fed. Cir.1996) (citing *Perkin–Elmer Corp. v. Westinghouse Elec. Corp.,* 822 F.2d 1528, 1532 (Fed.Cir. 1987)).

*Standard Oil Company v. American Cyanamid Co.,* 774 F.2d 448, 452 (Fed.Cir.1985). Thus, representations by the patent applicant, which describe the unique features of a patent to distinguish other patents, set the boundaries of the invention which the patentee is barred from expanding under the doctrine of equivalents. *See, e.g., Alpex Computer Corporation v. Nintendo Co. Ltd.,* 102 F.3d 1214, 1221 (Fed.Cir.1996); *Standard Oil,* 774 F.2d at 452–53; *Lockwood,* 107 F.3d at 1575. At issue in this motion are whether prosecution history estoppel applies to two of the elements of the Plaintiff's Claim 1:(1) the requirement that the silicone rubber elastomer be uncured; and (2) the requirement of a primer containing three specific chemical elements: ethyl silicate, ethyl ortho silicate and tetra butyl titanate.[10]

With respect to the first element at issue, Plaintiff maintains that the use of cured or partially cured silicone is legally equivalent to its use of uncured silicone rubber, required by Claim 1. However, in the patent specification section titled "DISCUSSION OF PRIOR ART," the Plaintiff distinguishes a prior patent, the "Hurst" patent in the following manner:

> An example of an adhesive used in conjunction with a silicone polymer surface is to be found in Hearst [sic] U.S.Pat. No. 3,632,368 issued Jan. 4, 1972. In this patent, a topical structure involves a paper substrate having a polyethylene layer and silicone coating carried thereon and receiving an adhesive release surface. It is taught that the silicone surface and release surface may be treated with a corona discharge to control the release force required. *However, no suggestion is to be found of a primer between the polyolefin and silicone surfaces, **and** the silicone surface **is not analogous** to that to that of the instant invention in that the polymer is not taught to be an **uncured** silicone elastomer.*

('148 patent specification) (Emphasis added)

This passage in the patent specification attempts to distinguish a prior patent due to

its failure to utilize an "uncured" silicone rubber elastomer. Thus, Plaintiff would seem to be barred by its own patent prosecution history from asserting infringement based on the Defendant's use of cured or partially cured silicone rubber in the bonding process. The Plaintiff argues that this quoted passage "was ultimately not used to distinguish the reference," because it only "commented on the cured nature of the silicone in "Hurst." (*See* Pl. Brief at 15.)" The Court disagrees; the language used clearly indicates an intent by the author to distinguish the Hurst patent based on the uncured nature of Plaintiff's silicone element. Thus, the application of prosecution history estoppel must bar the Plaintiff from attempting to include the use of a cured or partially cured silicone element within the scope of its patent under the doctrine of equivalents.

Defendant also raises the defense of prosecution history estoppel in opposition to any claim of equivalence between its primer and the Plaintiff's. In its original patent application, the Plaintiff specified its particular three chemical primer and the percentage of each in the section titled "DETAILED DESCRIPTION OF THE INVENTION." As previously stated, the Patent Office rejected the Plaintiff's initial application as "obvious" in light of prior patents: "Stevenson," "Young," "McBride," "Hurst," and "Hamada." Specifically, the patent office pointed out that the Hamada patent "offers further support by teaching the use of primers comprising titanate and silicates in organic solvent for improving adhesion between silicone rubber and a substrate." (*See* Patent Rejection Letter dated 02/14/84 at 4–5.) In their response letter, the Plaintiff distinguished its primer from the Hamada primer stating "The bonding composition of Hamada et al *is a rather specific and involved organosilicone compound not particularly analogous to the specific primer of applicant's invention.*" (*See* Reconsideration Letter at 7.) Further, the Hamada patent itself specifies that one of its primer elements is "Tetraalkoxysi-

---

**10.** The Courts previous findings prevent the finding of literal infringement as to these two ele-

ments.

lane" which is an alkoxysilane by definition.[11] (*See* Hamada Patent, col. 2, line 48–52). Thus, while the Plaintiff's expert argues in this case that the alkoxysilane portion of the Defendant's primer is equivalent to the Plaintiff's ethyl silicate element, the Plaintiff previously argued to the patent office that Hamada's primer, which also contained an alkoxysilane, was not analogous to Plaintiff's "specific primer."

At oral argument, the Plaintiff suggested that it distinguished the '148 patent *only* from a very specific non-analogous primer in Hamada. Plaintiff argued that any distinction drawn in Plaintiff's prosecution history between the Hamada primer and the Plaintiff's primer, was only applicable to the specific three element primer used in Hamada, and would not have an estoppel effect on a finding that the Defendant's primer is equivalent to the Plaintiff's primer.

■ The Court disagrees. While it is true that an estoppel bars the recapture of only that subject matter which was *actually surrendered* during prosecution, *see Litton Systems, Inc. v. Honeywell, Inc.,* 140 F.3d 1449, 1455–56 (Fed.Cir.1998), this does not necessarily mean the estoppel only applies to the precise elements of the distinguished prior art.[12] In the present case, the Patent Office originally found the Plaintiff's patent to be obvious in light of Hamada, in part, because Hamada teaches "the use of primers comprising titanate and silicates in organic solvent for improving adhesion between silicone rubber and a substrate." (See Patent Rejection Letter dated 02/14/84 at 4–5). Thus, the patent office referred to Hamada's primer in a very general sense—encompassing a *category* of chemicals which would include the Plaintiff's primer. The Plaintiff's response to this observation was to distinguish the Patent Office's generalization by highlighting their primer's *specific chemical composition.* Thus, the Plaintiff was surrendering more than just the specific chemical composition that made up the Hamada patent, they were surrendering a definition of their primer in general or non-specific terms. Plaintiff may not now re-expand the scope of its primer to cover the Defendant's primer which, at best, is only generally analogous to the Plaintiff's primer. *See Lockwood,* 107 F.3d at 1572 (" '[c]laims may not be construed one way in order to obtain their allowance and in a different way against accused infringers' ") (citing *Southwall Technologies, Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1576 (Fed.Cir.1995)).

Therefore, the Court finds that the Plaintiff is estopped as a matter of law by its own prosecution history from asserting that the Defendant's process infringes its '148 patent under the doctrine of equivalents. Accordingly, Defendant's motion is granted.

### Conclusion

After considering the arguments of the parties, their briefing and submissions, the entire relevant record, and the applicable law, the Court finds that the Defendant's accused process does not infringe the Plaintiff's '148 patent, as a matter of law, based on the application of prosecution history estoppel with respect to the elements and limitations of the Plaintiff's patent. Therefore, it is hereby

ORDERED that the Defendant's motion for summary judgment is GRANTED, and Plaintiff's Complaint is DISMISSED in its entirety.

**IT IS SO ORDERED.**

---

**11.** This fact is significant because the basis of the Plaintiff's expert opinion that the two primers at issue are equivalent is based on the presence of a alkoxysilane element in each. Plaintiff's expert opines:

> ILT's amino silane contains an alkoxysilane portion and an amino portion. *The alkoxysilane portion of the amino silane molecule is essentially identical to that found in ethyl silicate and/or ethyl ortho silicate.* The Alkoxysilane groups react with the hydroxyl groups on the surfaces of the corona treated polypropylene and corona treated silicone laminate to form a bridge of covalent bonds in the same manner that the ethyl silicate and/or ethyl ortho silicate reacts with the materials in the claim.

(*See Crivello* Aff. at 10.) (emphasis added)

**12.** The Court must evaluate the prosecution history to determine the scope of the estoppel's limiting effect which can fall anywhere on a "spectrum ranging from great to small to zero." *See id.* at 10.